# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| HOWARD W. COSBY, | : | |
| Plaintiff, | : | CASE NO. 3:19-cv-401 (MPS) |
| | : | |
| v. | : | |
| | : | |
| TAWANNA, et al., | : | |
| Defendants. | : | APRIL 30, 2019 |
| | : | |

_____

## INITIAL REVIEW ORDER

Plaintiff Howard W. Cosby ("Cosby"), incarcerated at the MacDougall-Walker Correctional Institution in Suffield, Connecticut, filed this case under 42 U.S.C. § 1983. He contends that the defendants violated his rights under the First, Eighth, and Fourteenth Amendments as well as RLUIPA and the ADA. Cosby seeks damages from the defendants in individual and official capacities as well as injunctive relief.

The Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. This requirement applies to all prisoner filings regardless whether the prisoner pays the filing fee. *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 159 (D. Conn. 2005) (citing *Carr v. Dvorin*, 171 F.3d 115 (2d Cir. 1999) (per curiam)). Here, the plaintiff is proceeding *in forma pauperis*.

Although detailed allegations are not required, the complaint must include sufficient facts

to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). The Court must construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 472 (2d Cir. 2006). To plead a cognizable legal claim, however, a *pro se* plaintiff must meet the standard of facial plausibility. *See Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) ("[A] *pro se* complaint must state a plausible claim for relief.") (citing *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009)).

I.     Allegations[1]

On December 18, 2018,[2] custody staff tried to place an inmate in Cosby's cell. The inmate told defendants Harris and France that he had a bottom bunk pass. Cosby also had a bottom bunk pass. ECF No. 1 at 17. In addition, Cosby had obtained permission from ADA Coordinator defendant Hall to choose a compatible cellmate because of Cosby's disability needs.

---

[1] The facts are taken from Cosby's declaration, ECF No. 1 at 10-17, submitted in lieu of reciting the facts in the complaint.

[2] Cosby incorrectly includes this date in the declaration as December 18, 2019. ECF No. 1, at 10.

*Id*. at 10.

Cosby told Officers France and Harris of his permissions. He also told them that they would be jeopardizing his safety and security if they put the inmate in his cell. Officer Harris said that the inmates could fight and ordered the inmate to enter Cosby's cell. *Id.*

At 6:30 p.m., the cell was opened for recreation. Cosby asked Officer France to open the legal room. When Cosby told Officer France that he was wrong to put the other inmate in his cell, Officer France said that he was following orders. *Id.* The other inmate wanted to fight with Cosby and followed him into the legal room. Cosby talked the inmate out of fighting and asked Officer France to call a lieutenant. Cosby explained the situation to defendant Lieutenant Jazmin. Lieutenant Jazmin denied that Cosby had any permissions from ADA Coordinator Hall. When Cosby offered to show him the permissions, Lieutenant Jazmin refused. *Id.* Cosby was issued disciplinary reports and taken to the restrictive housing unit ("RHU").

En route to RHU, an officer injured Cosby's right leg and foot by pushing Cosby's wheelchair over them. Cosby yelled in pain and complained to all staff present. *Id*. at 11. Lieutenant Jazmin did not order Cosby brought to the medical unit. Instead, he directed that he be brought to RHU. Defendant Nurse Joe was in RHU. When Lieutenant Jazmin did not tell him about Cosby's injury, Cosby reported the injury to Nurse Joe. *Id*.

While Cosby was complaining that he did nothing wrong, Lieutenant Jazmin ordered two officers to stand Cosby on his disabled left foot and injured right foot. Cosby yelled in pain while Nurse Joe and other officers watched. Cosby told Nurse Joe, Lieutenants Jazmin and Rivera, and the other officers that it was wrong for them to stand and watch him being abused. *Id*.

3

Cosby told the officers searching him that he was permitted to keep his Buddhist rosary. The officers took the rosary and did not return it. Nurse Joe and other custody staff members stood by and did not intervene. Lieutenant Jazmin ordered Cosby's shoelaces removed. Cosby explained that he needed the shoelaces for support and to stabilize his orthotic device for his left foot to no avail. Cosby informed all staff present that they were violating his ADA rights. *Id*.

Before he was placed in RHU cell 3, Cosby asked Lieutenant Jazmin, Nurse Joe and all other custody officers present for his disability aids. These aides included a wheelchair, walker, knee braces, ankle braces, orthopedic shoes, compression socks, back binder, urinal, and diapers. Cosby never received any of the aids. Nurse Joe said that Cosby's medical chart included no passes, approvals, or doctor orders permitting the aids in RHU. Cosby also told Lieutenant Jazmin that approvals for the aids were in his medical charts. Nothing was done. *Id*. Cosby also asked Nurse Joe, Lieutenant Jazmin, and all custody officers present for a handicap accessible cell and shower. Neither was provided. *Id*.

Nurse Joe x-rayed Cosby's right foot and gave him an ice pack and Motrin. The defendants left Cosby in the RHU cell. He was immobile because his wheelchair and other aids were not provided. *Id*.

During the night, when Cosby tried to get to the toilet to urinate his plastic orthotic slipped out of his shoe. Cosby was unable to bear his weight on his injured right foot. He fell injuring his head, back, and ankles. *Id*. at 12. Cosby called for help. Officer Gerris, who is not a defendant, responded and said he would call the medical unit. He did not do so. Cosby kept yelling for help and wiggling his fingers under the cell door. Unit officers toured the unit but ignored Cosby's calls. Eventually, Cosby saw a light and awoke in the infirmary. A nurse told

him that he had been unconscious and the on-call doctor had ordered him taken to the infirmary. *Id*.

On the morning of December 19, 2018, Cosby spoke with ADA Coordinator Hall and asked her to ensure that he received his wheelchair and other aids in RHU. He sent her a follow-up written request the next day. Defendant Hall did not respond to the request. *Id*.

The same morning, a doctor visited Cosby. When Cosby recounted the incident and complained of difficulty moving his back as well as back and head pain, the doctor told Cosby that he was not assigned to Cosby, and that Cosby's doctor would see him on December 23, 2018. Cosby requested x-rays and examination as well as use of his aids in RHU but the doctor, who is not a defendant, would not help. *Id*.

During the second shift on December 19, 2018, defendant Lieutenant Mihaliak stopped in front of Cosby's infirmary room and told other officers that he felt like killing Cosby. *Id*. Lieutenant Mihaliak and the other officers entered the room to take Cosby back to RHU. When Cosby said that he was handicapped, badly injured, and had not yet received x-rays, Lieutenant Mihaliak said that he did not care. Nurses John and Jane Doe were present but permitted the officers to return Cosby to RHU. *Id*.

Cosby complained that the officers risked further injury by moving him. Lieutenant Mihaliak did not care. Lieutenant Mihaliak also rejected the idea of requesting a video camera to record the transfer. *Id*. Lieutenant Mihaliak ordered officers to pick up Cosby and put him in his wheelchair. They further injured Cosby's back when they lifted him. Cosby requested that they leave the wheelchair in his cell and return his other aids. They refused. *Id*. at 13.

At Lieutenant Mihaliak's order, two officers carried Cosby into his cell by his hands and

feet. They intentionally slammed Cosby's head into the bunk ladder and threw him on the bunk. They removed his handcuffs and left the cell. *Id.* Lieutenant Mihaliak and defendant Officer Gardiner dropped Cosby's sneakers into the cell. Cosby was on the bunk with his head off the edge. Lieutenant Mihaliak threw Cosby's walker across the cell injuring Cosby's head and bruising his left arm, which Cosby had raised to protect his head. Cosby complained to medical and custody staff, but everyone refused to help him. He spoke and wrote to defendants Grant, Paton, Hall, and Mulligan. *Id.* RHU Manager Paton read Cosby's request when Cosby handed it to him though the cell door but did nothing. *Id.* at 15.

Cosby remained in RHU for seventeen days. During that time, he was provided only one handicap shower. *Id.* at 14. Staff refused to throw out Cosby's trash and there were problems with the toilet in his cell. *Id.* at 13-14. On December 27, 2018, water from Cosby's toilet flooded his cell. A plumber was called to address a problem on the upper tier that caused the toilets on the lower tier to overflow. *Id.* at 14. The plumbers and tierman cleaned the water from the hallway and all cells except Cosby's. *Id.*

During the second shift, Cosby complained to Lieutenant Mihaliak and Officer Gardiner about his flooded call. They ignored him and refused to have the cell floor cleaned of the water, feces, urine and toilet paper. Cosby fell on the wet floor. When he called for help, the officers laughed at him before finally calling a code. Lieutenant Jazmin warned Cosby that a chemical agent would be deployed if he moved and, at the same time, ordered him to get up. Two nurses were present but did nothing to help him. Lieutenant Jazmin and other officers roughly dragged Cosby into the hallway and put him on a stretcher. Officer Gardiner pressed the plastic sides of the stretcher to cover Cosby's face and pressed his sternum with force. The nurses told custody

staff that Cosby was faking.  *Id*.

In the infirmary, Lieutenant Jazmin ordered the camera turned off and began accusing Cosby of faking.  He told Cosby that if Cosby sued him, he would press outside charges.  *Id*.  Cosby was returned to RHU.  *Id*. at 15.

Cosby was released from RHU on January 3, 2019.  He noticed that $800.00 of his property had been stolen from the property room.  The property officers first accused Cosby of lying, but then verified his purchases and told him to submit a written request preliminary to his filing a property claim form.  Cosby has not yet received a response to his written request.  *Id*.

A few days after returning to his housing unit, an inmate told Cosby that some of his property had been held in the unit bubble.  Cosby went to the bubble and asked an officer who does not usually work in that unit for his property.  The officer returned a large portion of Cosby's legal work and one of his prayer rugs.  Cosby assumes that Officers Harris and France, who had issued him the allegedly false disciplinary report that resulted in the RHU placement, had stolen the property that was found in the bubble.  *Id*.

RHU Manager Paton and his staff refused to give Cosby grievance and request forms while he was in RHU.  Officer Gardiner tampered with Cosby's religious diet by giving him partial meals and putting toilet paper in his trays.  Officer Gardiner also refused to give Cosby clean clothes and linen or clean his cell.  *Id*.  The smell in Cosby's cell caused him to experience headaches.  His skin was covered with urine and feces.  *Id*. at 16.  Warden Mulligan, Counselor Grant, RHU Manager Paton and several nurses denied Cosby pain medication.  *Id*.  Lieutenant Jazmin, Officer Gardiner, Lieutenant Mihaliak, and other staff repeatedly called Cosby a rapist.  Other inmates also have begun calling Cosby a rapist.  *Id*.

Cosby was found not guilty of the threats charge that resulted in his RHU placement. Two other disciplinary charges that resulted from the threats charge were not dismissed. *Id.*

II.   <u>Analysis</u>

Cosby names forty-two defendants: RN Supervisor Tawana, ADA Coordinator Hall, RHU Manager Paton, Correctional Officer Bushnell, Correctional Officer Robinson, Correctional Officer Landrie, Warden Mulligan, RHU Counselor Grant, Correctional Officer Lugo, Correctional Officer France, Correctional Officer Harris, Lieutenant Jazmin, Lieutenant Rivera, Lieutenant Mihaliak, two Lieutenants John Doe, Correctional Officer Gardiner, Correctional Officer Thomasassin, Correctional Officer Sullivan, Correctional Officer Beartrand, RN Gloria, RN Shawna, RN Jane Doe, RN John Doe, RN Joe, and seventeen John Doe correctional officers. He asserts the following claims: denial of liberty subjecting him to atypical and significant hardship, cruel and unusual punishment in violation of the Eighth Amendment, denial of freedom of religion in violation of the First Amendment, deliberate indifference to serious medical needs, retaliation in the form of verbal and physical assault, denial of access to courts, use of excessive force, violation of RLUIPA, violation of the Title II of the ADA and Section 504 of the Rehabilitation Act, and violation of Article first, section 8 of the Connecticut Constitution. Cosby also states that the defendants discriminated against him because of his disability and Buddhist beliefs.

A.   <u>ADA and Rehabilitation Act Claims</u>

Cosby states that all of the named defendants were involved in denying him the disability aids and handicap accessible showers and cell. ECF No. 1 at 13. He challenges this denial as violating his rights under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

8

12101, et seq., and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794(a).

"[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Accordingly, Cosby's claims against the defendants in their individual capacities are dismissed pursuant to 18 U.S.C. § 1915A(b)(1).

Cosby seeks damages and injunctive relief against the defendants in their official capacities. He requests a handicap accessible single cell. ECF No. 1 at 16. He also seeks medical care at an outside hospital to determine whether he has any problems with his head, back, neck, or legs from the actions alleged in the Complaint as well as x-rays, MRI scans, and regular physical therapy. Finally, he seeks an order that he be provided handicap transportation whenever he leaves the facility. *Id.* at 17. "Title II and Rehabilitation Act suits for prospective injunctive relief may, under the doctrine established by *Ex parte Young*, 209 U.S. 123 (1908), proceed against individual officers in their official capacity . . . ." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quotation marks omitted).

"In an official capacity suit seeking money damages against a State official, the State is deemed to be the real party in interest because an award of damages would be paid from the State Treasury." *DeLoreto v. Ment*, 944 F. Supp. 1023, 1031 (D. Conn. 1996). A State official sued in his official capacity is therefore "entitled to invoke the same Eleventh Amendment immunity as that belonging to the state." *Id.* "[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 159

(2006).[3] Crosby's claim for money damages may therefore proceed provided that the ADA violation he alleges also amounts to a violation of the Fourteenth Amendment. The Fourteenth Amendment incorporates the Eighth Amendment protection from cruel and unusual punishment. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (plurality opinion). Under the RA, a plaintiff may recovery money damages "upon a showing of a statutory violation resulting from 'deliberate indifference' to the rights secured the disabled" under the Act. *Garcia*, 280 F.3d at 115. Punitive damages are not available in private suits under the ADA or the RA. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002) ("Because punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act.").

The standards for determining whether Cosby states a claim against the defendants in their official capacities under the ADA and the RA are almost identical. The only difference in the statutes is that the RA applies to entities receiving federal assistance, and Title II of the ADA applies to all public entities. *See Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 320 & n.13 (D. Conn. 2008). The difference in the two statutes is not relevant to this analysis. *See*

---

[3] Before the Supreme Court's decision in *Georgia*, the Second Circuit held that plaintiffs could recovery money damages under the ADA only if they established that the defendant official was motivated by discriminatory animus or ill will due to disability. *See Garcia*, 280 F.3d at 112. The Second Circuit has not yet revisited its holding in *Garcia* in light of *Georgia*. *See Bolmer v. Oliveira*, 594 F.3d 134, 147 n. 3 (2d Cir. 2010). Where, as here, a plaintiff's claim arises under the Due Process Clause of the Fourteenth Amendment, *Garcia*'s requirement of discriminatory animus may not apply. *Id.* at 148. In any event, Cosby's allegations that he repeatedly fell due to inadequate accommodation for his disability and that the defendants nevertheless refused to provide additional accommodations or allow him to remain in the infirmary for treatment are sufficient to establish a prima facie case of discriminatory intent.

*Super v. J. D'Amelia & Assocs., LLC*, No. 3:09-cv-831(SRU), 2010 WL 3926887, at *13 (D.

Conn. Sept. 20, 2010) (explaining that Connecticut's continued acceptance of federal funds

constitutes a waiver of its immunity from suit under § 504 of the RA). Except as otherwise

noted, the discussion below applies to both the ADA and RA claims.

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by such

entity." 42 U.S.C. § 12132. This provision applies to state prisoners. *Pennsylvania Dep't of*

*Corr. v. Yeskey*, 524 U.S. 206, 213 (1998). The statute is intended to "eliminate discrimination

on the basis of disability and to ensure evenhanded treatment between the disabled and the able-

bodied." *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998).

To state an ADA claim, Cosby must allege facts showing that he is a qualified person

with a disability, that he was excluded from or denied benefits of a service, program or activity,

or otherwise discriminated against, and that the denial or discrimination was due to his disability.

*Phelan v. Thomas*, 439 F. App'x 48, 50 (2d Cir. 2011) (quoting *Hargrave v. Vermont*, 340 F.3d

27, 34-35 (2d Cir. 2003)). The ADA defines "disability" as "a physical or mental impairment

that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Walking is

considered a major life activity. *See* 42 U.S.C. § 12102(2)(A). The determination whether an

individual is disabled should be made without considering ameliorative effects of medication or

assistive devices. *See* 42 U.S.C. § 12102(1)(A). When analyzing these claims, "courts have

been careful to distinguish impairments which merely affect major life activities from those that

substantially limit those activities." *Troeger v. Ellenville Cent. Sch. Dist.*, 523 F. App'x 848, 852

(2d Cir. 2013) (citation and internal quotation marks omitted); *see Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir. 1998) ("Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled.").

Cosby does not identify his disability. He merely alleges that the Department of Correction has permitted him a wheelchair, walker, various braces, assistive devices, and a bottom bunk pass. In light of these devices, the Court assumes that Cosby's ability to walk is significantly impaired and will assume, for purposes of this ruling, that he is disabled.

Cosby alleges that, initially, he was not provided any of the devices in RHU and, later, only the walker. He was denied a handicap accessible cell and access to a handicap accessible shower while in RHU. He also alleges that he was unable to walk from the bunk to the toilet and fell causing injury. As discussed below, the fall also provides a plausible basis for Crosby's claim under the Eighth Amendment claim for deliberate indifference to medical needs. Thus, Crosby's allegations are sufficient to state plausible ADA and RA claims for prospective injunctive relief and compensatory damages. His claims for punitive damages under the ADA and RA are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

B.      RLUIPA and Freedom of Religion Claims

Cosby alleges that the defendants violated his rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1, and the First Amendment.

RLUIPA prohibits state and local governments from taking actions that substantially burden the religious exercise of any person unless the government shows that the action

constitutes the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000cc-1; *Holt v. Hobbs*, ___ U.S. ___ 135 S. Ct. 853, 859 (2015). RLUIPA was intended to provide greater protection than available under the First Amendment Free Exercise Clause. *Holt,* 135 S. Ct. at 859-60. However, RLUIPA does not authorize recovery of damages against state officials in either individual or official capacity. *Sossamon v. Texas*, 563 U.S. 277, 293 (2011); *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014). In addition, RLUIPA does not create a private right of action against state officials in individual capacity. *Washington v. Gonyea*, 731 F.3d 143, 144 (2d Cir. 2013).

Cosby's requests for injunctive relief relate only to his disability or medical treatment. He requests a handicap accessible single cell. ECF No. 1 at 16. He also seeks medical care at an outside hospital to determine whether he has any problems with his head, back, neck, or legs from the actions alleged in the Complaint as well as x-rays, MRI scans, and regular physical therapy. Finally, he seeks an order that he be provided handicap transportation whenever he leaves the facility. *Id.* at 17. As Cosby seeks no injunctive relief related to his RLUIPA claim and cannot obtain damages for a RLUIPA violation, this claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

Cosby also alleges that the actions of the defendants violated his First Amendment right to freedom of religion. The First Amendment Free Exercise Clause requires that government officials respect, and avoid interference with, the religious beliefs and practices of the people. *See Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). Prisoners retain some rights under the Free Exercise Clause. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). Their rights, however, are balanced against legitimate penological objectives. *See id.; Salahuddin v. Goord*, 467 F.3d

263, 274 (2d Cir. 2006) (government action challenged under the Free Exercise Clause "passes constitutional muster if it is reasonably related to legitimate penological interests").

To state a First Amendment free exercise claim, Cosby must make a threshold showing that "the disputed conduct substantially burden[ed] his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75). He must allege facts showing that he sincerely holds a particular belief, that the belief is religious in nature, and that the challenged action substantially burdened his exercise of that belief. *See Ford*, 352 F.3d at 588-91. A belief is substantially burdened where the state has "put[] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 177 (D. Conn. 2009) (internal quotation marks and citation omitted). In considering whether a prisoner has made the required showing, the court does not "evaluate the objective reasonableness of the prisoner's belief" but considers only whether the prisoner "sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590.

The Second Circuit has expressed doubt whether a prisoner is required to make this threshold showing. *See Holland*, 758 F.3d at 220 (noting that *Salahuddin* holding regarding substantial burden threshold requirement may have been overruled by *Employment Div. v. Smith*, 494 U.S. 872, 887 (1990), but declining to reach the question); *see also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) (noting that the court has not yet decided issue and assuming that substantial burden requirement applies). District courts within this circuit continue to apply the substantial burden test when addressing free exercise claims. *See, e.g., Jones v. Annucci,* No. 16-CV-2516(KMK), 2018 WL 910594, at *13 (S.D.N.Y. Feb. 14, 2018) (applying substantial burden test).

14

Cosby alleges that, upon entering RHU, unspecified officers took his Buddhist rosary and did not return it. He also alleges that Officer Gardiner gave him partial religious meals. Cosby identifies no sincerely held religious belief that was substantially burdened by these actions and does not allege that the defendants were attempting to force him to modify his behavior or violate his beliefs. Thus, Cosby fails to state a plausible First Amendment claim. The First Amendment Free Exercise Clause claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b)(1).

C.     Deliberate Indifference to Medical Needs Claims

The Eighth Amendment forbids deliberate indifference to prisoners' serious medical needs. *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). To state a claim for deliberate indifference to a serious medical need, Cosby must show both that his medical need was serious, and that the defendants acted with a sufficiently culpable state of mind. *See Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Estelle v. Gamble*, 492 U.S. 97, 104 (1976)). There are both objective and subjective components to the deliberate indifference standard. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Objectively, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The condition must produce death, degeneration or extreme pain. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). Subjectively, the defendants must have been actually aware of a substantial risk that Cosby would suffer serious harm as a result of their actions or inactions. *See Salahuddin*, 467 F.3d at 279-80. Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference and is not cognizable under section 1983. *See id.*

Cosby identifies several injuries.  First, an unidentified officer pushed his wheelchair over his right foot.  The foot was x-rayed and Cosby was given Motrin and an ice pack.  Second, Cosby fell in his cell injuring his head, back and ankles and losing consciousness.  He was removed from the infirmary before receiving any tests or treatment.  Third, Cosby was tossed onto the bed by his hands and feet hitting his head on the bunk ladder and he was hit in the arm and head by the thrown walker.  Cosby alleges that tossing him on the bed further injured his back.  The walker caused a bruise on his arm.  Fourth, Cosby fell on the wet cell floor and was dragged out of the cell.  He was brought to the infirmary but again removed before any tests were performed.

Cuts and bruises, without more, do not rise to the level of serious medical needs.  *See El-Massri v. New Haven Corr. Ctr.*, No. 3:18-cv-1249(CSH), 2018 WL 4604308, at *8 (D. Conn. Sept. 25, 2018) (citing cases).  Regarding his foot, Cosby alleges that the foot was x-rayed and he was provided pain medication and an ice pack.  He does not allege that the foot caused any problems after the day of the injury.  *See Dallio v. Hebert*, 678 F. Supp. 2d 35, 44-45 (N.D.N.Y. 2009) (citing cases finding that temporary pain associated with bruises and other injuries for which pain medication was provided did not rise to level of serious medical need).  Regarding his head and arm, Cosby alleges that his head hit the bunk ladder and that he later shielded his head with his arm, suffering a bruise on his arm.  He alleges no facts suggesting that these injuries were long-lasting or severe.  Thus, the injuries to Cosby's foot and leg from the wheelchair and his arm and head do not rise to the level of a serious medical need.  Any deliberate indifference to medical needs claims based on these two incidents are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

16

When Cosby fell the first night, he lost consciousness. Although he was taken to the infirmary, he was removed before any tests were performed. Loss of consciousness can signify a serious medical need. *See, e.g., Martin v. Oey*, No. 9:16-cv-717(TJM/TWD), 2017 WL 6614680, at *7 (N.D.N.Y. Nov. 28, 2017) (assuming that cuts, bruises, and swelling accompanied by loss of consciousness constitutes serious medical need). When Cosby fell the second time, he was again taken to the infirmary but removed before any tests were performed. The loss of consciousness in the first fall is sufficient to allege a serious medical need. Although Cosby does not allege that he lost consciousness in the second fall, the fact that he was taken to the infirmary by stretcher supports an inference that this also could be a serious medical need. The pattern of removing Cosby from the infirmary before any tests could be performed suggests that Lieutenants Jazmin and Mihaliak and Nurses John and Jane Doe were aware of a substantial risk that Cosby would suffer serious harm as a result of their actions or inactions. The Court concludes that Cosby has alleged plausible deliberate indifference claims regarding the two falls.

D. <u>Due Process Claims</u>

Cosby alleges that he was deprived of liberty and subjected to atypical and significant hardship. The Court assumes that by this statement, Cosby is asserting a claim for violation of his rights under the Fourteenth Amendment Due Process Clause regarding the disciplinary hearings that led to his RHU placement.

To state a claim for violation of his right to procedural due process, Cosby must show that he had a protected liberty interest and that he was deprived of that interest without being afforded due process of law. *Sandin v. Conner*, 515 U.S. 472 (1995). He has a protected liberty interest only if the state created a liberty interest in a statute or regulation and the deprivation of

that interest caused him to suffer an atypical and significant hardship. *See Tellier v. Fields*, 280 F.3d 69, 80-81 (2d Cir. 2000). Thus, Cosby must allege facts demonstrating both that, as a result of the guilty finding, he suffered an atypical and significant hardship in relation to the ordinary incidents of prison life and that the state has created a protected liberty interest in freedom from such disciplinary sanctions.

"[T]he duration of [segregated] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000). Both confinement under harsh conditions for a short time and confinement under less harsh conditions for a longer time may be atypical. Thus, the Second Circuit has "avoided a bright line rule that a certain period of [restrictive housing] confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citing *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999)). Where a detailed factual record is lacking, the Second Circuit has "affirmed the dismissal of due process claims only in cases where the period of time spent in [restrictive housing] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in [restrictive housing]—and there was no indication that the plaintiff endured unusual [restrictive housing] conditions." *Palmer*, 364 F.3d at 66 (citing cases); *see Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 412 (D. Conn. 2016) (granting summary judgment on due process claim where inmate served 20 days in punitive segregation and inmate "alleged no facts suggesting that sanctions were qualitatively different from ordinary prison life").

Cosby was held in RHU for seventeen days, far fewer than the thirty days in *Sandin*. He alleges few facts regarding the conditions in RHU, only that correctional staff would not remove trash from his cell and that, on one day, his cell floor flooded with waste and the defendants did

not clean it. He also was denied his assistive devices in RHU. The Court need not, however, determine whether these conditions are sufficient to render Cosby's stay in RHU an atypical and significant hardship. Cosby has not identified any process that he did not receive at the disciplinary hearing. He only contends that the charges were false. Due process requires that the decision of a hearing officer be supported by "some evidence." *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985). Cosby alleges no facts suggesting that there was no evidence presented at the hearing to support the charges. That Cosby does not agree with the charges does not show that there was no evidence presented to support them. As Cosby has identified no process he was not afforded, he fails to plausibly allege a procedural due process claim.

      E.      <u>Conditions of Confinement Claims</u>

Cosby asserts that the conditions in RHU and the denial of his assistive devices subjected him to unconstitutional conditions of confinement. To state a cognizable Eighth Amendment claim based on unconstitutional conditions of confinement, Cosby must allege facts establishing "both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.'" *Phelps v. Kapnolas*, 308 F.3d 180. 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1999)). A condition is objectively serious if it deprives an inmate of "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal quotation marks omitted)). To meet the subjective component, Cosby must allege facts showing that prison officials knew "of and disregard[ed] an excessive

19

risk to inmate health or safety," that is, the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and … dr[e]w the inference. *Id.* at 185-86 (quoting *Farmer*, 511 U.S. at 837) (internal quotation marks omitted).

Cosby alleges that his RHU cell was not handicap accessible and, except for one instance, he was not provided a handicap accessible shower. Correctional staff would not remove trash from his cell and would not clean his cell when the toilet overflowed. In addition, Cosby was denied all his assistive devices for some of the time and all devices except his walker for the remainder of the time. Cosby was twice returned to RHU from the infirmary before any tests were conducted. Cosby's shoelaces were taken despite his claims that the laces were required to stabilize the orthotic in his shoe. Correctional officers called Cosby a rapist within hearing of other inmates, who then repeated the name. Taken together, these conditions show a disregard for inmate safety.

Cosby alleges that he informed all defendants and any correctional staff within hearing every time the defendants took some action that he believed would endanger his safety. He fell in the cell twice because he did not have his assistive devices. These allegations are sufficient to state a plausible claim that the defendants were aware that Cosby was subjected to a substantial risk of serious harm. The conditions of confinement claim will proceed.

F.   Excessive Force Claims

Cosby alleges that the defendants used excessive force against him or failed to intercede to prevent the use of excessive force. Cosby describes four incidents of use of force. First, an unidentified officer ran over his right leg and foot with the wheelchair. Second, officers tossed him onto the bunk by his hands and feet, slamming his head into the bunk ladder. Third, officers

20

roughly dragged him from his cell through toilet waste water. Fourth, officers covered his face with the sides of the stretcher and pressed with force on his sternum.

The use of excessive force against a prisoner can constitute cruel and unusual punishment in violation of the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 4 (1992); *accord Wilkins v. Gaddy*, 559 U.S. 34, 34, 36 (2010) (per curiam). The "core judicial inquiry" is not "whether a certain quantum of injury was sustained but rather whether force was applied in a good faith effort to maintain and restore discipline, or maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7).

To state a claim for use of excessive force, Cosby must allege facts establishing objective and subjective components. *See Sims v. Artuz*, 230 F.3d 14, 20-21 (2d Cir. 2000). The objective component focuses on the harm done to the prisoner in light of contemporary standards of decency. The amount of harm required depends on the nature of the claim. *Id.* at 21. Although there must be some injury, serious injury is not required. *Wilkins*, 559 U.S. at 34 ("[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury."). However, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Id.* at 37 (quoting *Hudson*, 503 U.S. at 9)). The subjective component requires a showing that the use of force was "carried out 'maliciously and sadistically' rather than as part of 'a good faith effort to maintain or restore discipline.'" *Id.* at 40 (quoting *Hudson*, 503 U.S. at 9). The extent of the inmate's injuries is one factor the court may use to determine whether correctional staff could "plausibly" have considered the force necessary in a particular situation. *Hudson*, 503 U.S. at 7. Other factors include "the need for application of force, the relationship between that need and the amount of force used, the threat

reasonably perceived by the responsible officials, and any effort made to temper the severity of a forceful response." *Id.* (internal quotation marks and citation omitted).

Cosby does not allege facts showing that he suffered a serious injury as a result of any use of force. The Court cannot, however, discern any good faith reason for the force used. Accordingly, the excessive force claims will proceed at this time.

Cosby also alleges that other defendants stood by and watched while the force was used. "[T]he question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016). No single factor is dispositive. "The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." *Id.* at 107-08.

Cosby alleges only that other defendants were present and did not intervene. The allegations are insufficient for the Court to evaluate the factors identified above to determine whether the defendants had a realistic chance to intervene. However, as the excessive force claims are proceeding, the Court will permit these claims to proceed for further development of the record.

G.     Retaliation Claims

Cosby alleges that the defendants retaliated against him "as usual for Peacefully Fighting For What[']s Right, Civil Rights, and Human Rights both Physically and Orally." ECF No. 1 at 16. The Court assumes that this claim is based on Cosby's repeated statements to all present that

what was happening to him violated his rights and his written complaints to defendants Mulligan, Paton, Hall, and Grant.

To state a retaliation claim, Cosby must that (1) he engaged in protected speech or conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between his protected speech and the adverse action. *Bilal v. White*, 494 F. App'x 143, 146 (2d Cir. 2012). Because retaliation claims by prisoners are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts. Conclusory allegations of retaliatory conduct are not sufficient. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) ("First Amendment retaliation claims brought by prisoners must 'be supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.'") (citation omitted).

"While courts in this Circuit have found that verbal complaints may be protected for the purposes of a First Amendment retaliation claim, the Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate." *Patterson v. Patterson*, No. 1:16-CV-844EAW, 2019 WL 1284346, at * 8 (W.D.N.Y. Mar. 20, 2019) (internal quotation marks and citation omitted). For purposes of this ruling, the Court will assume that verbal complaints will support a retaliation claim.

Cosby implies that retaliation for asserting his rights is a usual occurrence. He alleges that he asserted his rights repeatedly to everyone present every time he thought the defendants' actions violated his constitutional rights. He also identifies repeated constitutional violations, presumably the responses to his complaints. The Court will permit the retaliation claims to proceed at this time to enable Cosby to further develop the record.

H.      Access to Courts Claims

Cosby alleges in conclusory fashion that the defendants denied him access to the courts by denying him legal calls and not sending out his legal mail complaining about his treatment in RHU. ECF No. 1 at 16. To state a claim for denial of access to the courts, Cosby must demonstrate that the defendants acted deliberately and maliciously and that he suffered an actual injury. S*ee Lewis v. Casey*, 518 U.S. 343, 353 (1996). To establish an actual injury, Cosby must allege facts showing that the defendants took or were responsible for actions that hindered his efforts to pursue a legal claim, prejudiced one of his existing actions, or otherwise actually interfered with his access to the courts. *See Monsky v. Moraghan*, 127 F.3d. 243, 247 (2d Cir. 2002).

Cosby does not identify any case that was dismissed because of the defendants' actions during the seventeen days he was in RHU. Nor does he identify any case that he was prevented from filing. To the extent that Cosby implies that the failure to send out legal mail complaining about his treatment in RHU prevented him from pursuing a legal action on those claims, he has filed this action. The Court concludes that Cosby has not shown that he suffered an actual injury as a result of the defendants' actions. The claim for denial of access to the courts is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

I.      Property Claims

Cosby alleges that Officers Harris and France stole some of his property. Claims for deprivation of property, negligent or intentional, do not rise to the level of constitutional violations. The Supreme Court has found that the Due Process Clause is not violated when a prison inmate loses personal belongings due to the negligent or intentional actions of correctional

24

officers, if the state provides an adequate post-deprivation compensatory remedy. *See Hudson v. Palmer*, 468 U.S. 517, 531 (1984). The State of Connecticut provides an adequate remedy for the deprivation Cosby describes. *See* Conn. Gen. Stat. § 4-141 et seq. (providing that claims for payment or refund of money by the state may be presented to the Connecticut Claims Commission). In addition, the Department of Correction has an institutional remedy to assert claims for lost or damaged property. *See* Department of Correction Administrative Directive 6.10, section 37 and Directive 9.6, section 16, https://portal.ct.gov/DOC/AD. This remedy is not rendered inadequate merely because Cosby anticipates a more favorable outcome in federal court or it may take longer for the state claim to be resolved. *See Hudson*, 468 U.S. at 535.

Cosby alleges that he was directed to submit a request to the Department of Correction as a preliminary step in asserting a property claim. Should that fail, he also has recourse to the Claims Commission. Thus, Cosby has an adequate remedy. Any claim for stolen property is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

J.     Official Capacity Damages Claims

Cosby seeks damages from the defendants in individual and official capacities. The Eleventh Amendment bars claims for damages against state officials in their official capacities unless the state has waived this immunity or Congress has abrogated it. *Kentucky v. Graham*, 473 U.S. 159, 169 (1995). Section 1983 does not abrogate state sovereign immunity, *Quern v. Jordan*, 440 U.S. 332, 343 (1979). Congress has abrogated sovereign immunity for claims under the ADA for "conduct that actually violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. at 159. Accordingly, all claims for damages against the defendants in their

official capacities, except for those brought under the ADA, are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

K.       State Constitutional Claims

Cosby contends that the defendants violated his rights under Article first, section 8 of the Connecticut Constitution. Article first, section 8 is the state due process clause. The Connecticut Supreme Court has declined to recognize a cause of action for damages for violation of this provision. *See Ward v. Housatonic Area Reg'l Transit Dist*., 154 F. Supp. 2d 339, 356 (D. Conn. 2001). In light of the state court determination, the federal court has declined to entertain a supplemental state law claim under this provision. *See Doe v. Mastroloni*, No. 3:14-CV-718(CSH), 2016 WL 593439, at *17-18 (D. Conn. Feb. 12, 2016) (declining to exercise supplemental jurisdiction over state law claim for violation of Article first, section 8 of the Connecticut Constitution and citing cases). Accordingly, the Court declines to exercise supplemental jurisdiction over this claim.

III.      Conclusion

For the foregoing reasons, the following claims are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b): Cosby's RLUIPA claim; First Amendment Free Exercise Clause claim; denial of access to the courts claim; the deliberate indifference claims relating to the injury to his leg and foot and to his head and arm; due process claim, property claim, and all claims for damages from the defendants in their official capacities except those brought under the ADA; and ADA and RA claims against the defendants in their individual capacities and those seeking punitive damages. The Court declines to exercise supplemental jurisdiction over Cosby's supplemental claim for violation of Article first, section 8 of the Connecticut Constitution.

The case will proceed on Cosby's ADA and RA claims for injunctive relief and compensatory damages, the Eighth Amendment deliberate indifference to medical needs claims relating to the two falls, the Eighth Amendment conditions of confinement claim, the use of excessive force and failure to intervene claims, and the retaliation claims.

The Court enters the following orders:

(1)    **The Clerk shall** contact the Department of Correction Office of Legal Affairs to ascertain the service or current work address for defendants Tawana, Hall, Paton, Bushnell, Robinson, Landrie, Mulligan, Grant, Lugo, France, Harris, Jazmin, Rivera, Mihaliak, Gardiner, Thomasassin, Sullivan, Beartrand, Gloria, Shawna, and Joe, mail a waiver of service of process request packet containing the Complaint to each defendant at the address provided within **twenty-one (21) days** of this Order, and report to the court on the status of those waiver requests on the thirty-fifth day after mailing.  If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on the defendant in his or her individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2)    **The Clerk shall** prepare a summons form and send an official capacity service packet to the U.S. Marshal Service.  The U.S. Marshal is directed to effect service of the Amended Complaint on defendant Jones in her official capacity at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within **twenty-one (21) days** from the date of this order and to file a return of service within thirty (30) days from the date of this order.

(3)    **The Clerk shall** send the plaintiff a copy of this Order.

(4)     **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(5)     The defendants shall file their response to the amended complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above.  They also may include all additional defenses permitted by the Federal Rules.

(6)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order.  Discovery requests need not be filed with the court.

(7)     All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this order.

(8)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9)     If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that the plaintiff MUST notify the court.  Failure to do so can result in the dismissal of the case.  The plaintiff must give notice of a new address even if he is incarcerated.   The plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address.  The plaintiff should also notify the defendant or the attorney

for the defendant of his new address.

(10)    The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court.  The plaintiff is advised that the Program may be used only to file documents with the court.  Local court rules provide that discovery requests are not filed with the court.  D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendants' counsel by regular mail.

(11)    The Court cannot effect service on the John and Jane Doe defendants without their full names and current work addresses.  Cosby is directed to ascertain this information through the discovery process and file a notice identifying the Doe defendants.  As there are many unidentified defendants, Cosby is directed to indicate in his notice what actions each identified defendant took that violated his constitutional rights.

**SO ORDERED** this 30th day of April 2019 at Hartford, Connecticut.

_____/s/_____
Michael P. Shea
United States District Judge